### FORD v. WALLACE. (No. 11528.)

(Court of Civil Appeals of Texas. Fort Worth. March 27, 1926. Rehearing Denied May 8, 1926.)

1. **Vendor and purchaser** ⊜⇒261(4)—**Knowledge by purchaser of vendor's lien note that seller and wife lived on premises is not notice of defect in deed by seller and wife.**

Knowledge by purchaser of vendor's lien note that seller and wife were living on premises was not notice to purchaser of seller's fraud in procuring wife's signature and acknowledgment to deed.

2. **Acknowledgment** ⊜⇒55(2)—**Wife cannot impeach certificate of notary taking her acknowledgment to deed of homestead based on valid consideration for husband's fraud in representing character of instrument or notary's failure to comply with law so as to affect rights of innocent purchaser.**

Where husband and wife execute deed conveying homestead, wife cannot impeach certificate of notary taking her acknowledgment,

where there is valuable and adequate consideration for deed, and mere fact that husband fraudulently misrepresented character of instrument signed by wife, coupled with notary's failure to comply with law in taking wife's acknowledgment, will not affect rights of innocent purchaser of vendor's lien.

Appeal from District Court, Young County; H. R. Wilson, Judge.

Action by H. M. Ford against M. M. Wallace and another, in which Mrs. Susie L. Wallace filed plea of intervention. Judgment for the intervener, and plaintiff appeals. Reversed and rendered in part, and in part left undisturbed.

Fred T. Arnold, of Graham, for appellant. S. A. Penix, of Graham, for appellee.

BUCK, J. The following is the statement of the nature and result of the action made by appellant and agreed to by appellee, and which we adopt:

"On the 15th day of March, 1922, M. M. Wallace and his wife, Susie Wallace, were living together as man and wife, and they owned, among other property, lots Nos. 23 and 24 in block No. 15 of the town of Graham, which was community property between them. On that date they executed a deed to W. W. Benson, wherein they conveyed these lots and the building situated thereon to W. W. Benson, the consideration being stated in the deed as $2,000 cash in hand paid, and one note executed by W. W. Benson, payable to M. M. Wallace in the sum of $2,500, due on or before March 15, 1923, with interest from date at rate of 8 per cent. per annum, and providing for usual attorney fees, if sued on or placed in the hands of an attorney for collection. The note was secured by a vendor's lien on the lots set out above. The deed was duly signed by both M. M. Wallace and his wife, Susie Wallace, and acknowledged before one W. D. McFarlane, a notary public of Young county, Tex., and the acknowledgment shows to be statutory in its form. The deed was duly delivered and placed of record in the deed records of Young county, Tex., on the 27th day of March, 1922.

"On the 29th day of March, 1922, M. M. Wallace, for a valuable consideration to him in hand paid, sold and transferred the note for $2,500 and the lien securing the same to H. M. Ford, the plaintiff below and the appellant in this court, and this transfer was duly acknowledged and placed of record in the deed records of Young county, Tex., on the 31st day of March, 1922.

"The payee in the note defaulted in payment, and suit was filed by H. M. Ford on the 21st day of July, 1923, against W. W. Benson as maker of the note, and against M. M. Wallace as indorser thereon, and judgment was asked on the note, interest, and attorney fees, with foreclosure of the vendor's lien. On September 1, 1923, Mrs. Susie L. Wallace, the divorced wife of M. M. Wallace, filed her plea of intervention, wherein she setup that she was the former wife of M. M. Wallace; that they were divorced on March 26, 1923, after the execution of the deed and note in question, and said further that at

⊜⇒For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

the time of the execution of the deed that it was intended by her to be a deed of trust on her homestead, and not a deed thereto; that she signed the same through fraud, duress, and undue influence of her husband; that she did not read the instrument, and was ignorant of its legal effect; that it was not explained to her as being a deed; and that no one explained it to her except her husband, who told her that it was a deed of trust on the homestead to secure the payment of a loan; that the deed was nothing more or less than a mortgage on her homestead, and hence void.

"Plaintiff filed certain exceptions to the plea in intervention which were sustained by the court, whereupon the intervener filed a supplemental plea of intervention, which is in the nature of an amendment, and had for its purpose to avoid the consequences of the ruling of the court on the special exceptions. The plaintiff urged the same exceptions to the supplemental plea, and they were by the court overruled.

"The case was submitted to the jury on two issues only, i. e.: Did the grantors and grantee intend the instrument to be a deed or a mortgage, and did Mrs. Wallace think that it was a mortgage at the time she executed it? Both of these issues were answered in favor of the intervener, and judgment was duly rendered thereon declaring the deed in question to be a mortgage and on the homestead of the intervener, and therefore void."

The trial court recited in its judgment that it appeared to the court that the instrument in question was intended and understood by the grantors and grantee as a mortgage, and that the property in question "is and was the homestead of intervener [Mrs. Wallace] at the time of the execution of said mortgage, and was given to secure debt, and that she was in possession thereon at said time and prior thereto, and that plaintiff had due notice thereof at the time he purchased said note in question, and was not an innocent purchaser of same for value without notice, and is therefore not entitled to foreclose his purported lien aganist the above described property; the same being the homestead property of intervener," etc. The trial court's finding 'that plaintiff had notice of intervener's rights in and to said property must rest entirely, if at all, upon her possession and occupancy of the property, for there is absolutely no evidence except her possession that plaintiff had any notice, constructive or otherwise, that the purported deed was intended by the parties thereto as a mortgage. Plaintiff testified that he never knew that she had ever lived on the property until about a month or six weeks after he had purchased the note, when he took dinner one day with Fred Arnold, his attorney, and asked Arnold who lived at the "Stewart house," the property in question, and next door to Arnold's home, and Arnold told him Mrs. Wallace lived there; that he then asked Arnold if that was not the place he held a note against, and Arnold replied that it was. Mrs. Wallace testified that she knew Ford

well, and that he visited a place close to her often, and saw her occupying the house, before and after he purchased the note, and he had ample opportunity to see her about the place and knew she was using it. That he never made any inquiry about the place. But Ford testified that the only time he was ever at the Wallace home prior to the purchase of the note was some six or seven years before, and that the Wallaces were not living at that time at the place next to Fred Arnold.

[1] But, if Ford knew at the time he purchased the land note that the Wallaces were living at the place against which the note was executed, such fact would not be notice of any defect in the execution of the purported deed. In Eylar v. Eylar, 60 Tex. 315, in an oft-cited opinion by Judge Stayton, the Supreme Court said:

"In the case of Mullins, Guardian, v. Wimberly, 50 Tex. 446 [457], the question seems to have been considered, and the opinion seems to limit the application of the rule that possession is notice of whatever title the possessor has, to cases in which the possessor is not knowingly in fault in permitting a deed which he has executed to be placed on record, or to cases in which the possessor has not voluntarily aided in misleading a purchaser. The facts of that case were peculiar, and one of the grounds upon which the title of the possessor was sustained, although a deed of the ancestor of the guardian's wards was shown to have been executed and recorded before the right of the claimant attached, was that the instrument through which the claimant asserted title was executed in mutual mistake as to the land which both parties intended should be covered by it. Many cases can be found in our reports in which it is said that possession is notice of whatever title the possessor has. Among them are the following: Watkins v. Edwards, 23 Tex. 443; Hawley v. Bullock, 29 Tex. 223; Mainwarring v. Templeman, 51 Tex. 212; Wimberly v. Bailey, 58 Tex. 227. All of these were cases in which the rule was applicable, and the language must be understood with reference to the facts of the cases.

"It would seem that the sole office which possession performs, in the matter of notice, is to put a person desiring to purchase upon inquiry, and that it has no effect in determining what the inquiry shall be, or of whom it shall be made.

"The policy of the law, as evidenced by our statutes, requires all conveyances of land or interests therein for a term longer than one year to be evidenced by writing, and when parties place, in this the most certain and enduring form, the evidence of their right, they ought to be held, so far as third persons are concerned, to have therein spoken truly in respect to the title to the land to which the conveyance relates.

"That all persons who may deal with persons claiming land may have the means of knowing in whom titles to land rest, and that no one may buy what appears to be a good title, when another person may have better right not made public, the law requires all persons, for the protection of innocent purchasers and creditors, to register their titles to land.

"Such being the case, can it be said, even if possession is sufficient in all cases to put purchasers upon inquiry, that such inquiry is not prosecuted sufficiehtly far, when the person who desires to buy examines the, records of the county and finds on record a deed from the person in possession to the person who offers to sell, and who under that deed asserts title?

"If the inquiry is prosecuted to the highest source which the law of the land declares shall exist for the determination of title, and to the source which the parties have created as the highest evidence of their respective rights, can it be true that it is further necessary to examine sources inferior and make inquiry as to whether or not there are claims, or even rights, in others not evidenced as the law requires, or otherwise the purchaser be charged with constructive notice of secret vices in the title which he buys?

"To so hold, we are of the opinion, would be to strike at the very foundation of the policy upon which registration laws rest.

"That there are cases to which registration laws do not apply is true, but those are cases in which titles vest by operation of law, or cases in which there has not been a wrongful holding out of some person to be the true owner of land, when in fact some other person has the better right, and not cases in which parties, as between themselves, have executed instruments evidencing their respective rights, which may be and which the law requires to be registered.

"By the deed in question, the parties who now assert claim through a secret agreement declared in the most solemn form that the land in controversy was the property of O. A. Eylar. They permitted that declaration to be placed on record for the very purpose of giving information to all persons as to the true ownership.

"Such being true, can the simple fact that they remained in possession of the land which they had declared belonged to another, which they might lawfully do as the tenants at sufferance or otherwise of such other person, make it requisite for any person who may desire to buy from the person whom they have so declared to be the owner, to inquire of themselves whether or not they had uttered the truth in their deed, whether or not their own declaration was false?

"We are of the opinion, under the facts in this case, that a purchaser from O. A. Eylar was not bound to inquire of the appellees what right they had in the land; that the inquiry was sufficiently prosecuted; prosecuted as far as a prudent man, having a due regard to the rights of others, and to his own protection, would be bound to prosecute it, when he looked to the record and there found that·O. A. Eylar was declared by the very persons in possession to be the true and absolute owner of the land."

Therefore, if Ford, when Wallace offered to sell him the note in question, had gone to the deed records and found there recorded a deed executed by both of the Wallaces conveying the land to Benson, and reciting the execution of this note and the retention of a vendor's lien to secure the same, the fact that the Wallaces were in possession of the property would not be constructive notice to Ford of any claim that Mrs. Wallace had thereto. The uncontradicted evidence sustains the contention of appellant that he was an innocent purchaser of the note, unless he is charged with notice of Mrs. Wallace's claim based on fraud practiced on her by her husband in securing her signature and acknowledgment to the deed. In Graves v. Kinney, 95 Tex. 210, 66 S. W. 293, the Supreme Court said:

"But to the purchaser of the note, the papers executed by all the parties presented a transaction in which there was a regular and lawful sale of the homestead, in which the cash installment of the purchase money had been paid, and the remainder was secured by the note with a valid lien on the property; and the question is, whether the court, in ascertaining his rights, should look behind the evidence of their rights which the other parties had thus created and upon which he acted, or should, in his favor, hold them to the transaction as they had made it appear to be. The decisions of this court have, it seems to us, settled the question in favor of the purchaser. Hurt v. Cooper, 63 Tex. 362; Heidenheimer v. Stewart, 65 Tex. 321; Love v. Breedlove, 75 Tex. 649 [13 S. W. 222]; Eylar v. Eylar, 60 Tex. 315."

See, also, Brooker v. Wright, 216 S. W. 196, by this court, in an opinion by Chief Justice Conner; Harris v. Hamilton, 221 S. W. 273, by the Commission of Appeals. In this last-cited case, the court distinguished the facts in that case, and it may be said in this case from the facts in Moore v. Chamberlain, 109 Tex. 64, 195 S. W. 1135. In the Moore v. Chamberlain Case, the Supreme Court held that, where land when purchased at a sale under a trust deed was in possession of tenants of former owner, the purchaser was, as a matter of law, placed on inquiry as to whether the deeds from such prior owner and a subsequent deed were absolute or only intended as a mortgage. But in this case last cited the court further held that the innocent purchaser of a vendor's lien note, issued in one of the transactions in which the deeds were executed, could foreclose his vendor's lien. Payment of this note was tendered, and no question as to the right of the holder of ·the vendor's lien·to recover was in the case as decided by the court.

We, therefore, conclude that mere possession by Mrs. Wallace of the premises did not put appellant upon inquiry. Apparently it was upon the theory that such possession charged plaintiff with notice of any irregularities or fraud practiced in the execution of the purported deed which caused the trial court to deny plaintiff the right of recovery.

But does the failure, as claimed, of the notary to explain to Mrs. Wallace the nature of the instrument, a deed in form, she was executing in anyway deprive an innocent purchaser of the note of his right of foreclosure? It has been held that an instrument not explained to a married woman by the officer taking her acknowledgment, at the time of the privy examination, is not properly acknowledged, even though the married

woman in fact fully understands it from other sources. Speer's Laws of Marital Rights, § 210, p. 255; Norton v. Davis, 83 Tex. 32, 18 S. W. 430; Blume v. White (Tex. Civ. App.) 111 S. W. 1066; Evart v. Dalrymple (Tex. Civ. App.) 131 S. W. 223; Stringfellow v. Braselton, 54 Tex. Civ. App. 1, 117 S. W. 204; Kopke v. Votaw (Tex. Civ. App.) 95 S. W. 15, writ refused.

Mrs. Wallace testified that her husband had been urging her for some time to join him in securing a loan from a Dallas mortgage company on their home; that he told her he would have the loan extended over five years of time, and could pay it off, and that she would not lose her home; that she resisted, but that he insisted, and threatened to leave her if she refused; that on the occasion of her execution of the purported deed Mr. Wallace brought· W.˙D. McFarlane, the notary, home with him one day, and got her at a neighbor's, and she went into the room where the notary was seated, and Mr. McFarlane said, "Mrs. Wallace, you and Mr. Wallace have talked the signing of this paper over?" and she said,· "Yes"; and he said, "Are you going to sign them?" and she said, "Yes, but because he wanted me to, not my will"; and he said, "Well, you will sign them, won't you?" and she said, "Yes"; that the notary then opened out the paper and gave her a pen, and she signed the instrument, and the notary went away without any other conversation; that he did not read the instrument or explain it to her, all he asked her was if she and Mr. Wallace had talked it over; that he came back to the house in about thirty minutes, and asked her if she would sign those papers again, and she asked why she should sign them again; that he said they were dated wrong, and he wanted her to sign them again, and she asked him why he could not rub out the date and put the correct date; that he replied, "Well, you wouldn't mind this," and she said nothing, and signed the paper without any further conversation; that she did not read the second instrument, and did not know what it was; that the notary did not attempt to explain either of the instruments to her, and did not attempt to read either of them, and no one else read them to her or attempted to explain them, and that she did not read either one of them.

McFarlane testified that Wallace came to his office and asked him to draw a deed; that Wallace took the deed and was gone for some time, and there was some little error, perhaps in the description of the land, and Wallace brought it back, and called attention to the error, and the correction was made; that Wallace took him to his home in his car, and he sat in the house while Wallace was gone to look for his wife; that Mrs. Wallace came into the room, and Mr. Wallace introduced her to him, and that Mr.

Wallace then went out of the room; that he· did not remember the exact conversation· that occurred in regard to the deed, but in substance it was this:

"I knew they had been discussing it, and I had known Mal for several years, and I just asked her if she understood the deed, and signed it for the purposes and considerations therein expressed. She said she did, and sat down, and I think I held the deed for her while she signed it. She did not ask me to read the deed to her. I just asked her if she understood what she was doing, and she said she did. She did not have the deed in her possession and carry it in another room while I was there. Mal had the deed when he went in there. She wasn't in the living room when we came in. He went on in the back part of the house, and was gone 10 or 15 minutes, and then both of them came back. I don't remember whether he handed me the deed or laid it on the table. She had the deed in her hand. I don't know whether she had it while they were in the back room. She had it in her possession while we were there in the living room. I don't know how long she had it. She examined the deed and looked it over, and I asked her if she understood and signed it for the purposes and considerations therein expressed and she said she did. I don't know whether she read the deed or not. She had plenty of time to read the general substance of it. She was turning it over like she was reading it."

He further testified:

."I never had any idea about˙any of this at that time. I do remember this: I asked· her if she understood what she was doing and signed it for the purposes and considerations therein expressed, and she said she did. There was not anything said by her that she was signing that because Mal was making her sign it and she didn't want to do it. Mal was not in the room at˙ the time I took the acknowledgment. She was examined by me separate and apart from her husband. If she had said to me, in my capacity as a notary public, that she was signing that because her husband wanted her to, but she didn't want to sign it, I would not have taken her acknowledgment. If I had thought there was anything about the deed she didn't understand, I would have explained it to her, and if she had told me she didn't want to sign it, I would not have taken her acknowledgment. There was nothing said by any of them that led me to think there was any compulsion or fraud being practiced. If I had thought there was anything like that, I would have explained it to her, and advised her not to sign it. While she was there, there was no evidence of ill feeling or argument or coercion—none whatever. Everything was peaceable, so far as I could tell. There was nothing out of the way. As to whether there was any conspiracy on my part to substitute an absolute deed for a mortgage, will say I never heard anything about a mortgage mentioned. One time is all I remember taking· her acknowledgment to this instrument. I was only down there one time. It might be a fact that I went down in the afternoon and took her acknowledgment and then later on came back and told her there was a mistake in it

and I wanted to take it again, but if there was I don't remember anything about it. If that was done it was the same instrument both times, and I did not substitute another instrument."

The acknowledgment of Mrs. Wallace to the deed is in statutory form for a married woman. Speer's Law of Marital Rights, p. 226, § 174, says:

"But where the purchaser is entirely without fault, and is not chargeable in law with the knowledge of the defects of her conveyance or grounds authorizing a recovery, equity might require her to restore such purchaser his consideration paid her. And in the case of such contracts as she may by ratification affirm, it would not be at all proper to permit her to recover her property without a due return of the consideration received, even if she should be permitted to do so then; for it is difficult to see upon what principle she is entitled to a rescission at all when she has in law ratified the disposition of her property, which she has surely done when she refuses to return the consideration paid. At any rate, if the transaction be not in violation of any rule of law, she must return the benefits received before she is in a position to ask relief from her contract."

[2] Where the husband and wife execute in due form a deed conveying the homestead, the wife cannot impeach the certificate of the notary taking her acknowledgment of the same in due form, where there is a valuable and adequate consideration for the deed. The mere fact that the husband fraudulently misrepresented the character of the instrument which the wife signed, coupled with the fact that the notary did not comply with the law in taking her acknowledgment, will not affect the rights of an innocent purchaser. Webb v. Burney, 70 Tex. 322, 7 S. W. 841; Tobin v. Benson (Tex. Civ. App.) 152 S. W. 642, writ refused; Tinkham v. Wright (Tex. Civ. App.) 163 S. W. 615; Essex v. Mitchell (Tex. Civ. App.) 183 S. W. 399, writ refused; Richmond et ux. v. Hog Creek Oil Co. (Tex. Civ. App.) 229 S. W. 563; Texas Land & Loan Co. v. Blalock, 76 Tex. 85, 13 S. W. 12; Pierce v. Fort, 60 Tex. 464; Davis v. Kennedy, 58 Tex. 516. Hence we think we must sustain the assignment raising this question.

Without discussing other assignments presenting claimed error, we conclude that the judgment must be reversed in so far as the appellant and appellee are concerned, and, as the evidence seems to have been fully developed in the trial below, that judgment should be rendered for appellant, awarding a foreclosure of his vendor's lien against the property in controversy, and it is so ordered. The judgment against W. W. Benson and M. M. Wallace is left undisturbed. Costs of appeal taxed against appellee.

Reversed and rendered in part; left undisturbed in part.